UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

SONIA EBANKS, CORIN WRIGHT,
NATALIE VASSELL, ALETHEA MARTIN,
& JUNE WOOD-SMITH,

                   Plaintiffs,

 - against -                                       04 Civ. 8350 (CM)(LMS)

THE NEIMAN MARCUS GROUP, INC.,

                   Defendant.

----------------------------------------------------------x


### DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT NEIMAN MARCUS' MOTION FOR SUMMARY JUDGMENT

McMahon, J:


## I. Introduction

Plaintiffs Sonia Ebanks, Corin Wright, Natalie Vassell, Alethea Martin, and June Wood-Smith, all African-American females, were employed as sales staff or department managers by defendant Neiman Marcus Group at its White Plains, New York location. Between 2000 and 2003, all five plaintiffs allegedly received negative performance reviews and criticism from management, and were subject to hostility or rudeness from co-workers. Plaintiffs allege that this treatment was due to their race.

Plaintiffs Vassell, Martin, and Wood-Smith were terminated in 2003 for violations of store regulations. They assert that the stated reasons for their termination were wholly pretextual and their dismissals due to race-based discrimination or retaliation for prior complaints.

Plaintiffs Wright and Ebanks resigned in 2003 and 2005, respectively, but allege that they were constructively discharged. Plaintiffs brought this action under Title VII of the Civil Rights Act, New York Executive Law § 296, and 42 U.S.C. § 1981 for wrongful termination, discrimination in the terms and conditions of their employment, and retaliation.

Defendant Neiman Marcus now moves for summary judgment on all claims on the grounds that plaintiffs have failed to make out prima facie cases of discrimination, or, in the alternative, that it has established non-discriminatory reasons for its actions and that plaintiffs have failed to show these reasons to be pretextual.

For the reasons stated below, defendant's motion is granted in part and denied in part..

## II. Standard of Review

Under Federal Rule of Civil Procedure 56(c), the court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movants are entitled to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986).  Furthermore, where a plaintiff cannot establish an essential element of his claim, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 322-33.  On a motion for summary judgment, the court views the record in the light most favorable to the non-movants and resolves all ambiguities and draws all reasonable inferences against the movants.  See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962); Donahue v. Windsor Locks Bd. of Fire Commn'rs, 834 F.2d 54, 57 (2d Cir. 1987).

Plaintiffs assert that they were discriminated against in the terms and conditions of their employment: Ebanks was denied promotion and equal pay, Cmplt ¶ 84; and Wright, Vassell, Martin and Wood-Smith were wrongfully terminated. Cmplt ¶ 85. Plaintiffs, in their opposition papers to defendant's motion for summary judgment, further claim that Ebanks was constructively discharged from Neiman Marcus in April 2005. Plaintiff's Opposition at 2 (the complaint was never amended to include such a claim).

Claims of employment discrimination are analyzed under the "burden-shifting" framework defined in <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792, 93, S. Ct. 1817 (1973), and <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089 (1981). The burden initially falls upon the plaintiff to establish a prima facie case of racial discrimination in the terms and conditions of employment. To do so, plaintiff must show that: (1) she belongs to a protected class; (2) she was performing her duties satisfactorily; (3) she was subject to an adverse employment action; and (4) that the action occurred in circumstances giving rise to an inference of discrimination based on plaintiff's membership in that class. <u>See</u> <u>McLee v. Chrysler Corp.</u>, 109 F.3d 130, 134 (2d Cir. 1997).

An adverse employment action exists if plaintiff undergoes a "materially adverse change" in the terms and conditions of employment. <u>Galabya v. New York City Bd. of Educ.</u>, 202 F.3d 636, 640 (2d Cir. 2000). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." <u>Id.</u> (quoting <u>Crady v. Liberty Nat'l Bank & Trust Co.</u>, 993 F.2d 132, 136 (7th Cir. 1993)).

Once plaintiff has established a prima facie case, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the termination. See Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005). If such a reason is established, the burden then shifts back to the plaintiff to establish, by a preponderance of the evidence, that the reasons for her termination were pretextual, and that the motivating factor for her termination was racial discrimination. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742 (1993).

Plaintiffs Ebanks and Wood-Smith have also raised claims of retaliation under state and federal law. Cmplt ¶¶ 98, 105. Claims of retaliation follow a similar burden-shifting framework. To establish a prima facie case of retaliation, a plaintiff must show that:

> (1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer.

Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000). Once plaintiff has made out a prima facie case of retaliatory discharge, "the defendant must articulate legitimate non-discriminatory reasons for its actions." Holt v. KMI-Continental Inc., 95 F.3d 123, 130 (2d Cir. 1996). Finally, if the employer offers such proof, " the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).

Plaintiffs have raised claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, New York Executive Law § 296, and 42 U.S.C. § 1981. As with Title VII claims, analysis of claims under § 1981 and N.Y. Exec. L. § 296 are analyzed under the McDonnell Douglas framework. See Patterson v. McLean Credit Union, 491 U.S. 164, 186-88, 109 S. Ct. 2363

(1989) (abrogated on other grounds by Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991)); Cruz v. Coach Stores Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000). Claims under § 1981 require proof of discriminatory intent on the part of the defendant, a showing not required under Title VII claims. See Patterson v. County of Oneonta, 375 F.3d 206, 227 (2d Cir. 2004).

To bring a claim in Federal court under Title VII, plaintiffs are first required to exhaust available administrative remedies. Deravin v. Kerik, 335 F.3d 195, 200 (2d Cir. 2003). Plaintiffs, in their complaint, assert that they filed EEOC complaints related to the conduct at issue at various times, and that the EEOC issued a right to sue letter on their claims on July 20, 2004. Cmplt ¶¶ 4-5. Defendant, except where otherwise noted, does not challenge the sufficiency of plaintiffs' compliance with Title VII administrative remedies.

### III. The Record

Defendant submitted five Rule 56.1 Statements, one for each plaintiff. Plaintiffs responded with a single Opposition 56.1 Statement, which does not comply with the mandates of Rule 56.1(b) (requiring numbered paragraphs corresponding to defendant's statements, denying or admitting the contents thereof). Where plaintiffs' opposition statement fails to comply with Rule 56.1(b), I treat defendant's statement of facts as uncontroverted and plaintiffs' opposition statement as additional material facts as defined in Rule 56.1(b) and Fed. R. Civ. P. § 56(e).

Each party's statement of material facts must also "be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Local Rule 56.1(d). Plaintiffs' statement makes reference solely to unsworn affidavits from the five plaintiffs, four emails, and one spreadsheet listing revenues at the White Plains location by

salesperson and department. Defendant points out that the affidavits often speak in general, conclusory terms concerning facts about which plaintiffs are not competent to testify, in contravention of Fed. R. Civ. P. § 56(e). See, e.g., Reply Memorandum as to Claims of Natalie Vassell at 1-2. Defendant also notes that plaintiffs failed to file their opposition within the time guidelines, and requests that I disregard plaintiffs' opposition as a result. See Reply Memorandum as to Claims of Sonia Ebanks at 1, n.1. Defendant asks that I disregard plaintiffs' affidavits.

Defendant's request is denied. As to the form of plaintiffs' affidavits, the Second Circuit has held that an unsworn affidavit may nevertheless be admissible on a motion for summary judgment, provided that it complies in part with the requirements of 28 U.S.C. § 1746 (permitting unsworn declarations made under penalty of perjury to be used in place of sworn declaration). See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999). I find plaintiffs' affidavits do so comply. As to the timing of their submissions, any delay in filing opposition papers is not clearly established and at worst *de minimis*. Of course, conclusory statements or statements about which plaintiffs are not competent to testify will not be considered.

Because the facts underlying each plaintiff's claims are largely independent, I address each one individually.

A. Sonia Ebanks

Sonia Ebanks seeks relief under § 1981, Title VII, and N.Y. Exec. L. § 296 for wrongful

termination, failure to pay wages and benefits, failure to promote, and retaliation for her 2003 EEOC complaint.

*1. Facts*

Plaintiff Sonia Ebanks was hired in March 1999 as department manager for the Contemporary and Coats Departments. Defendant's Statement of Material Facts as to Claims of Sonia Ebanks ("SOMF-E") ¶ 1.

Each department manager is responsible for supervising operations and staff within one or more departments. Department managers report to one of two merchandise managers – in Ebanks' case, Michelle Penque, a white female – who in turn report to the store manager. SOMF-E ¶ 3. In 1999, the store manager apparently was Danny Akers; Akers' race is not specified in the record.

Department managers were evaluated annually, based on three factors: sales figures in their department, their "leadership" skills (i.e., their ability to manage employees), and their "management" skills (i.e., their ability to manage sales and inventory). SOMF-E ¶¶ 4-5. A manager's sales figures are based on the performance of the location as a whole, as well as the sales of his or her particular department. Performance, in turn, is measured by a department's reaching "plan"– the estimated dollar amount of sales for the department as determined at the beginning of the fiscal year. SOMF-E ¶¶ 12-14. Leadership and management ratings are set at the discretion of each manager's supervisor, although the review form contains guidelines for how to calculate leadership and management scores. Deposition of Sonia Ebanks ("Eb. Dep.") , Exh. 1. Plaintiff was told from the outset that "you are as good as your numbers" – meaning, in

her mind, that managers with good sales figures would receive high marks in leadership and management as well. Eb. Dep. at 147.

In February 2000, Danny Akers issued Ebanks her first performance review. Eb. Dep., Exh. 1. According to the review, her department generated approximately $2.25 million in sales, based on a plan of $2.506 million, approximately 10% "below plan." Id. She was rated "below expectations" in her sales figures, and "achieves expectations" on her leadership and management. Id. The blank on the form labeled "percent increase salary recommendation" read "#DIV/0!," a code used by Microsoft Excel when a number is divided by zero. Id. She was rated "too new" for promotion. Id.

Plaintiff was promoted to department manager for the Galleria Department in February 2000.[1] SOMF-E ¶ 2. Plaintiff alleges that such a promotion customarily entails a raise, which she did not receive. Plaintiff's Statement of Material Facts, ¶ 2.

Shortly thereafter, Beth Pine, a white woman, took over as store manager. According to Ebanks, Pine treated white employees more favorably than minorities. She socialized more with white managers, both in and out of work, SOMF-E ¶¶ 62-65; she did not offer Ebanks a folder of information on how to be a good manager that had been provided to white managers, SOMF-E ¶ 61; and, on two occasions, Pine yelled at Ebanks for her poor managerial skills and attendance. SOMF-E ¶¶ 129-131.

Pine was also allegedly cold and impolite towards Ebanks at work. At one point early on in Pine's tenure, Pine did not respond to Ebanks' greeting. SOMF-E ¶ 53; Eb. Dep. at 170. On

_____

[1]Both parties refer to this transfer as a promotion. However, Ebanks' title, job responsibilities, and wages remained the same.

another occasion, Pine greeted Corin Wright, manager of the Contemporary Department (and another plaintiff in this case) but did not greet Ebanks who was standing next to Wright. Eb. Dep. at 169. After these incidents, Ebanks stopped talking to Pine. SOMF-E ¶ 132. Plaintiff, based on her own observations, felt that Pine greets all the white managers. SOMF-E ¶ 55.

Defendant asserts that Pine has, on many occasions, been unwelcoming or rude to white employees as well – including yelling at white managers in public for poor performance. SOMF-E ¶¶ 133-139. Defendant also asserts that Ebanks never invited Pine or Penque to socialize with her, or to attend functions outside of work. Id.

Ebanks' fiscal 2001 sales goal for her department, or "plan," was $2,566,300. SOMF-E ¶ 12. Her department exceeded that amount by 3.8% – earning $2,663,600 in sales. SOMF-E ¶ 13. That figure exceeded the average sales of other departments at the White Plains location, which reached only 93.2% of plan, and of all Galleria Departments nationwide, whose sales reached only 86.8% of plan. SOMF-E ¶ 15. Ebanks' August 2001 performance review stated that she met expectations in leadership and management, and exceeded expectations in sales. SOMF-E ¶ 16; Pl's Dep., Exh. 10. She received a 2.9% raise. SOMF-E ¶ 17.

The next year, the Galleria Department was moved to a new, less desirable area of the store and reduced in size by approximately 30%. SOMF-E ¶ 18; Pl's SOMF ¶ 4. As a result, the Galleria Department plan for fiscal 2002 was reduced to $2,302,700 – approximately 10% less than the 2001 plan. SOMF-E ¶ 20. It is not clear how the 10% reduction in plan was set.

In May 2002, Pine attended a national general managers' meeting, which promoted the messages "Do Not Accept Mediocrity" and "Raise the Bar." SOMF-E ¶ 30. Upon her return to White Plains, she sought to implement these policies. SOMF-E ¶ 31.

Plaintiff's 2002 evaluation rated plaintiff as "exceeds expectations" in sales, but "below expectations" in leadership and management. Eb. Dep., Exh. 3. Defendant asserts that Ebanks' high rating in sales was due solely to the store's overall profitability, and that Pine and Penque, in assessing Ebanks's capabilities, gave more weight to her low departmental sales numbers. SOMF-E ¶ 24. Ebanks' department sold only $2,128,030 worth of merchandise – 92.4% of plan – even though her plan had been reduced to take into account the reduction in size of the Galleria Department during 2001. SOMF-E ¶¶ 21-22.

Ebanks' cumulative rating was 2.20. Eb. Dep., Exh. 3. The form defines 2.20 as an average score; however, Pine gave Ebanks an overall rating of "Below Expectations." Id.

Pine and Penque also attached a four-page typewritten addendum to the review, listing numerous criticisms of Ebanks' management style, such as her lack of ideas, poor communications skills, and unwillingness to be a team player. Eb. Dep., Exh. 3. According to handwritten comments on the form, Ebanks "totally disagree[d] with this review." Id. She also complained that management did not treat her with respect, listen to her, or go to her department to observe her management approach. Id.

Plaintiff was placed on probation as a result of this review. SOMF-E ¶ 34. She met with Rose Bennett, the head of Human Resources, and was given a "performance improvement plan" – a list of three tasks that she was to implement to improve her performance. SOMF-E ¶¶ 87-90. Plaintiff felt these tasks – setting up a contest to increase sales, promoting a certain vendor, and establishing a "Focus Day" in her department – were easy to accomplish and already part of her job description as a manager. SOMF-E ¶¶ 92-93. It is not clear whether probation was a common disciplinary tactic, although, during Ebanks' tenure at Neiman Marcus, at least one

white manager was placed on a performance improvement plan. Deposition of Lynn Grzymkowski at 77.

At least two white managers received raises based on their performance in fiscal 2002: Rosemarie Troiano and Mary Zicarelli. SOMF-E ¶¶ 41-48. According to defendant, both Troiano and Zicarelli were above plan for that year. Id.

In May 2003, plaintiff was asked to sign a second probation form related to her prior probation, apparently because the November 2002 evaluation was filled out on an incorrect form. SOMF-E ¶ 94. From plaintiff's comments on the form, it is clear that she interpreted this as a new citation. Eb. Dep. Exh 6. She concluded that the management was trying to fire her because "this store does not need African Americans on their staff." Id.. It is not clear whether plaintiff was still on probation at this point. SOMF-E ¶ 94.

On June 27, 2003, plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission (EEOC), alleging discrimination based on defendant's denial of raises and benefits. SOMF-E ¶ 95. In response, Gabrelle Martin, Neiman Marcus' Director of Associate Relations at its corporate office, came to White Plains to investigate Ebanks' complaints, as well as those of other African-American employees. SOMF-E ¶¶ 96-98. She found that there was a "communication challenge" between management and Ebanks, although she did not find that it was due to racism. SOMF-E ¶ 100.

After Martin's investigation, Plaintiff felt that her supervisors began to treat her better. SOMF-E ¶¶ 102-104. However, she still did not feel included in Pine's "inner circle." SOMF-E ¶ 105.

On August 25, 2003, Ebanks received her fiscal 2003 review. Eb. Dep. Exh. 4. Her sales

were at 123.2% of Plan, far better than all Galleria Departments in other locations (at 102.9% of plan) and other departments at that location (also at 102.9%). SOMF-E ¶ 109. She received "exceeds expectations" in sales, leadership, and management. SOMF-E ¶ 111. Her managers noted that she was improving with regards to her communications skills and assertiveness. SOMF-E ¶ 112-13. As a result of this evaluation, she received a 5.9% raise. SOMF-E ¶ 115. Plaintiff does not offer evidence of any incidents of discrimination during this year.

Ebanks' fiscal 2004 review, conducted on an unspecified date, showed equivalent ratings to her 2003 review. Eb. Dep. Exh. 9. Her sales were at 111.1% of Plan, equal to other Galleria Departments in other locations (at 111.2% of plan) and above other departments at that location (at 103.9% of plan). SOMF-E ¶ 118. She received "exceeds expectations" in sales, leadership, and management. SOMF-E ¶ 119. Plaintiff received a 5.0% raise as a result. SOMF-E ¶ 120.

On March 7, 2005, Ebanks resigned from Neiman Marcus, asserting that it was "too much of a discriminating company." SOMF-E ¶¶ 140-41. Pine asserts that Ebanks resigned to move to Florida and enter the real estate business, and made no reference to racial discrimination in her final interview. Deposition of Beth Pine at 41-42.

Ebanks was never promoted from Galleria. She asserts that, on one occasion, she expressed an interest in additional management responsibilities. SOMF-E ¶ 123. At an unspecified date, apparently prior to 2003, she petitioned Rose Bennett in Human Resources to separate the Coats and Contemporary Departments, and give her the Coats Department along with Galleria. Instead, a new manager was hired for Coats and Contemporaries. Plaintiff's

Deposition Part II (Eb. Dep. II) at 61.[2] Ebanks believes that Coats is paired with Galleria, rather than Contemporary, at other Neiman-Marcus locations (but offers no independent evidence). Id. Aside from this episode, Ebanks did not specifically seek any other promotion. Eb. Dep. II at 59. However, she asserts that management offered better positions to other managers without a formal process. For example, she asserts that a manager named Jim Arndt was given a second department – Men's Furnishings – and a $10,000 raise. Id. at 59-60.

Ebanks also asserts that she was made to work more late hours (meaning three weekday late nights per work-week) than white managers. SOMF-E ¶ 68. Defendant claims that, according to the time schedules, white managers worked as many or more late nights than plaintiff. SOMF-E ¶¶ 70-75.

Ebanks was also denied days off on two occasions: once to attend her aunt's 100th birthday and once for niece's wedding. SOMF-E ¶¶ 80-81. The wedding of Ebanks' niece was scheduled for the Saturday before Christmas, which is one of the busiest days of the year. Penque denied her the day off, but gave a white manager, Rosemarie Troiano, that Saturday off the next year. Defendant asserts that Troiano got the day off because she had arranged for coverage of her department, and made her request at an earlier time. SOMF-E ¶¶ 83-84. Defendant also claims that many employees were denied days off, and that at least two white

---

[2] The date of this request is not clear from the record. Plaintiff does not remember it, but asserted that, after her request was denied, "that's when they hired either Lee or Arlan." Nobody named Lee or Arlan managed Coats during plaintiff's tenure. SOMF-E ¶ 127. Ebanks' successor, named Lera Quistgaarol, took over on March 13, 2000; Lynn Grzymkowski took over in October 2002. Defendant submits that the phrase "Lee or Arlan" could only refer to Lera Quistgaarol, placing the time of the request in early 2000. I disagree. Ebanks' testimony could fairly be read as an error in transcription of the words "either Lera or Lynne." If this is true, then plaintiff's request was made in either early 2000 or late 2002.

managers complained to Human Resources about these denials. SOMF-E ¶ 86.

## 2. Discussion

### (i) Questions of Material Fact Exist as to Whether Ebanks Was Discriminated Against in the Terms and Conditions of her Employment

Plaintiff argues that Neiman Marcus discriminated against her in the terms and conditions of her employment by denying her raises and bonuses. Ebanks alleges that she was entitled to, but did not receive, bonuses in 2001 and 2002, a 2002 raise, and additional compensation upon her promotion to Galleria manager.

Ms. Ebanks has made out a prima facie case of wage discrimination. Denial of a raise or merit bonus where one is warranted constitutes an adverse job action. See Hunter v. St. Francis Hospital, 281 F. Supp. 2d 534, 545-46 (E.D.N.Y. 2003). Defendant acknowledges that raises for good performance on a manager's annual review were customary, and Ebanks has asserted (and defendant does not dispute) that at least one individual – Jim Arndt – received a raise upon his promotion to a different managerial position. Ebanks did not receive a raise at the time of her promotion or after her 2002 annual review, while several white managers did; she is African-American; and she has testified about several incidents that she experienced firsthand, incidents that support an inference of racially motivated discrimination in the workplace. Therefore, plaintiff has established a prima facie case of race discrimination in her compensation.[3]

Defendant offers a legitimate non-discriminatory reason for the 2002 denial – Ebanks'

_____

[3]Plaintiffs' complaint also claims that Ebanks did not receive a bonus in 2001 and 2002, although plaintiffs' opposition papers do not mention this issue. Neither side has provided evidence about Neiman Marcus' policy on annual bonuses (as opposed to annual raises, as detailed above). Plaintiff did in fact receive a raise after her 2001 performance review.

failure to reach "plan" and her subsequent performance review, which rated her "below expectations." It is undisputed that Ebanks' department did not make plan in 2001-2002, and that the white managers who received bonuses had higher sales ratings than she did.

Therefore, the burden shifts to Ms. Ebanks to establish a triable issue of fact on the issue of pretext. I find that, even according to defendant's version of the facts, material questions of fact exist about defendant's reasons for denying plaintiff's 2002 raise.

The decision to withhold a raise, the actual adverse job action in this case, was allegedly mandated by the results of Ebanks' 2002 performance review. However, her low rating is based in part on Pine's subjective assessment of her abilities.

Plaintiff's one objective figure, her sales ratings, were above 100%, according to the Neiman Marcus scale. She did not make plan, but her ratings were buoyed by the strong sales of the location as a whole. Of course, one may question the wisdom of tying managerial performance to the store's sales rather than just the sales in the manager's own department, but that is clearly Neiman Marcus' system.

Despite plaintiff's low ratings in management and leadership, both set solely at Pine's discretion, plaintiff's total rating was average. However, Pine disregarded the form and gave plaintiff an overall rating of "Below Expectations," and put plaintiff on probation as a result.

Of course, Pine might have been motivated by any number of non-discriminatory reasons for placing Ebanks on probation and denying her a raise. Whether defendant's reasons were in fact non-discriminatory, or were in part pretextual, should be determined by a jury. Similarly, whether Pine's unpleasant demeanor indicated hostility towards minorities, or a more general incivility towards all of her employees, is a question not fit for resolution on a motion for

summary judgment.

These issues of material fact preclude a grant of summary judgment on Ebanks' claims for wage discrimination.

*(ii) Ebanks Was Not Denied Promotion by her Employer.*

Ebanks also argues that she was denied further promotion after being moved from Contemporary and Coats to Galleria manger in 2000. In this Circuit, to raise a claim for failure to promote, plaintiff must allege that "she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion." Brown v. Coach Stores, Inc., 163 F.3d 706, 710 (2d Cir. 1998).

Ebanks raises only one instance after 2000 in which she sought a promotion – when she asked that the Coats Department be separated from Contemporary and added to her control. Ebanks made this request, at the latest, in October 2002, prior to the hiring of Lynn Grzymkowski.

Plaintiff's EEOC complaint, filed on or around May 27, 2003, did not mention any such claim. See Def. Exh. J. It is settled law that the "district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." Butts v. City of New York Dep't of Housing Preservation & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993) abrogated by 42 U.S.C. § 1981 on other grounds. Failure to include a reference to the prior denial of a promotion constitutes waiver of such a claim before this Court. See id. at 1402. There is nothing in the text of Ebanks' 2003 EEOC affidavit regarding a failure to promote, although it makes

-16-

reference to Neiman Marcus' failure to promote other African-American employees. Therefore, her failure to raise this issue in 2003 bars its consideration by this Court.

Even assuming that Ebanks' EEOC complaint could be broadly read to include a claim for failure to promote, she has failed to establish a prima facie case under Title VII, § 1981, or N.Y. Exec. L. § 296. Plaintiff's October 2002 request cannot be characterized as a request for "promotion" to Contemporaries and Coats, the departments she had left some years before. Rather, she asked that Coats be separated from the Contemporary Department and added to her current responsibilities. Defendant is entitled to use its judgment in deciding whether to make such changes in the departmental structure of the store. Neither federal nor state law guarantees the right to have such requests considered, let alone granted, and failure to accommodate plaintiff's request is not an "adverse employment action" under its definition in <u>Galabya</u>. Therefore, plaintiff has not made out a prima facie case for failure to promote.

*(iii) Ebanks Has Not Made Out a Prima Facie Case for Retaliation.*

Ebanks also claims that she was retaliated against for the filing of her EEOC complaint in 2003.

There is no question that filing such a complaint constitutes "protected activity" under Title VII, § 1981, and N.Y. Exec. L. § 296. However, there is not a scintilla of evidence in the record of any adverse employment actions taken against plaintiff after that time. Plaintiff was consistently given positive reviews and raises of about 5%, she sought no promotion during this period, and was not denied any other benefits. She was not terminated, but rather voluntarily resigned from Neiman Marcus two years later. <u>See</u> § III.A.2(iv) <u>infra</u>. Ebanks even concedes

that Pine's and Penque's conduct improved significantly after 2003. Plaintiff has therefore failed to put forward any evidence that would indicate a retaliatory adverse job action against her based on her May 2003 EEOC filing.

### (iv) Ebanks Was Not Constructively Discharged.

It is not disputed that Ebanks quit her job in 2005. However, she argues that her resignation was motivated because Neiman Marcus was "too much of a discriminating company" – implying some form of constructive discharge.

To establish a claim for constructive discharge, plaintiff must establish that Neiman Marcus, "rather than discharging [her] directly, intentionally creates a work atmosphere so intolerable that [she] is forced to quit involuntarily." Petrosino v. Bell Atlantic, 385 F.3d 210, 229 (2d Cir. 2004) (internal quotations omitted). "Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 73 (2d Cir. 2000).

The record evidence relating to the period from 2003 to 2005 (when Ebanks resigned) does not, as a matter of law, rise to the level of "intolerable." As noted above, Plaintiff earned raises of 5% per year, concedes that Pine and Penque's conduct improved markedly during this period, and sought no promotions (and therefore was not denied any). Even assuming Pine and Penque did not communicate with plaintiff as often as she would have liked, such an allegation falls significantly below the threshold of an "intolerable" atmosphere set forward in Petrosino. Therefore, Ebanks has failed to establish a prima facie case for constructive discharge.

*(v) Other Allegations Made by Plaintiff Do Not Constitute Adverse Job Actions.*

Plaintiff has also alleged numerous other incidents in which store management allegedly treated her in a discriminatory manner. Management denied her two requests for a day off; failed to keep her abreast of developments within the store; and failure to socialize with her both during and after work. None of these incidents, either independently or taken together, constitutes an adverse employment action under federal or New York law, in that they did not materially alter her job or her compensation.

Plaintiff also alleges that she was made to work more weekday evenings than white managers. She offers no evidence to support her conjecture, while defendant has proffered evidence that indicate plaintiff was not, in fact, required to work additional time. Plaintiff's unsupported conjectures do not raise a genuine issue of fact for the jury.

B. Corin Wright

*1. Facts*

Corin Wright was first hired at the White Plains location as an intern in June 2000. Defendant's Statement of Material Facts as to Claims of Corin Wright ("SOMF-W"), ¶ 1. Within a year, she was rapidly promoted to sales associate, sales coordinator, acting manager of Contemporary, and manager of Contemporary. SOMF-W ¶¶ 2-15. Like Ebanks, Wright reported to Beth Pine, the Store Manager, and Michelle Penque, the Merchandise Manager.

After becoming manager of Contemporary, Wright felt that she was treated unfairly by Pine. On one occasion, she was told her area looked "shitty," SOMF-W ¶ 18. Wright found the language and the manner in which Pine spoke to her to be offensive. SOMF-W ¶ 19. On another

occasion, Wright had a flat tire and was late for work. When she arrived (and although she had previously called in to report the flat tire), Pine yelled at her for two to three minutes. SOMF-W ¶ 22. After that incident, Wright complained to Human Resources, who set up a meeting between Pine and Wright. SOMF-W ¶ 23. At the meeting, Pine said that she would speak to Wright however she liked. SOMF-W ¶ 24.

On several occasions, she had difficulty scheduling vacations, or had planned vacation rescinded at the last minute. Deposition of Plaintiff Corin Wright ("Wr. Dep.") at 52-57. On one occasion, Wright confronted Pine over the last minute cancellation of a vacation, and the store reimbursed her for the amount she had already spent on travel arrangements. Id. at 54. On another occasion, when Wright took a sick day, Pine called her at home and asked her to come in to do "markdown" (an unscheduled repricing of inventory) despite her illness. Id. at 72. Wright did not come in, and markdown was done by someone else. Wright later spoke to Ro Troiano and another manager named Jean (likely Jean Theroux), and found that neither had been called at home on sick days. Pine, avers that, on at least two occasions, she has called white managers and asked them to come in on sick days. Declaration of Beth Pine, ¶¶ 6-7.

Wright also felt that she was undertrained and under-supported as a department manager. She was never provided with training as a manager; she was often under-informed about store-wide events, and she felt excluded by Pine or Penque in their day-to-day interactions with store personnel. Pl's SOMF ¶¶ 19-20. Penque also apparently made numerous dismissive comments to her via email, although those emails are not part of the record. Wright also claims that she did not receive an annual review. Id. ¶ 22.

In 2002, while working at Neiman Marcus, Wright enrolled in a class at the Fashion

Institute of Technology. Wr. Dep. at 86. Her class met on Tuesday nights at 6:00 PM. As a result, she needed to leave work at 5:00. Id. Management meetings at the store also took place on Tuesday afternoons, and were often still in progress at 5:00. Id. at 88-89. Wright claims she was made to feel bad about leaving the meetings, and on several occasions was late to class because she felt she had to stay until the end of the meeting. Id.

Wright was never suspended or placed on probation. Wr. Dep. at 99.

In September 2003, Wright resigned from Neiman Marcus. As part of the resignation process, she completed an "Associate Exit Form" and an online survey. Wr. Dep. at 108-110. She claims to have given the store average marks on the online form, but did not have the option of registering her displeasure with alleged racial discrimination. Id. Wright noted on the Associate Exit Form that her reason for leaving was "Personal." Id. She did not mention race on this form. Id. She did not have a face-to-face exit interview. Id.

Six months after her resignation, Wright sent a letter to a Mr. Roever in Dallas complaining about her treatment at the store. Id. at 107. This letter did not lead to any follow up by Neiman Marcus management.


*2. Discussion*

Wright's only claims are for constructive discharge under Title VII, N.Y. Exec. L. § 296 and § 1981. As stated in § III.A.2 (iv) supra, to establish a claim for constructive discharge, Wright must establish that Neiman Marcus "intentionally creates a work atmosphere so intolerable that [she] is forced to quit involuntarily." Petrosino, 385 F.3d at 229.

There are two fundamental problems with Wright's claim. First, the evidence does not

come close to demonstrating a workplace that was intolerable. And second, there is not a scintilla of evidence that anything Wright found offensive was connected to or motivated by her race.

Wright describes managers who were dismissive or who never admitted her (their subordinate) to their "inner circle," who on a few occasions made it difficult for Wright to attend to personal matters (vacation or illness). She was dissatisfied with her training and upset that the store refused to allow her enrollment in a class to interfere with attendance at mandatory store management meetings. She does not indicate that she was interfered with in her management of her department or in her dealings with her subordinates or customers; she does not point to any instances in which her race was even alluded to by Pine or Penque, her supervisors, or by anyone else; she does not attest to any humiliating or belittling incidents.

Wright's evidence, accepted as true for purposes of this motion, demonstrates only that she, like many of us, found her workplace not completely congenial to her preferences. She has some complaints about her supervisors, but most employees do. The various civil rights laws do not guarantee an employee a close collegial relationship with one's boss, or immunity from work's occasional interference with one's personal life, or a "perfect" workplace. Pine may have been nasty to Wright on a few occasions (the flat tire incident, the criticism of how Wright's area of the store looked), but Title VII and Section 1981 do not "establish a general civility code for the American workplace." Petrosino, 385 F.3d at 223. There is no evidence that Wright was subjected to a constant barrage of unwarranted criticism or intimidation by her boss, or that she was subjected to a pattern of frequent behavior that a reasonable trier of fact could conclude was designed to get her to quit.

In short, Wright's complaints are not either so frequent or by their nature so pervasive as to have made unpleasant to work at Neiman Marcus on a day to day basis – let alone met the legal standard of intolerability

Furthermore, Wright offers no evidence at all linking anything that happened to her to her race. She offers no evidence, for example, that white employees were allowed to leave meetings early to attend to personal business while she was not; or that white employees did not receive dismissive e-mails from Penque while she did; or that white subordinates of Pine and Penque were part of a preferred "inner circle" (or, for that matter, that any "inner circle" existed); or that white employees never experienced interference with their vacations.

The fact that two white managers to whom Wright spoke had never been asked to do unscheduled markdowns on a sick day does not mean that no white managers were ever asked to do unscheduled markdowns on sick days – and, indeed, the evidence discloses that the same request was made of white managers. In any event, this request was made to Wright once. Moreover, Wright did not leave her sickbed to come in and do the markdown, and there is absolutely no evidence that any disciplinary or other unfavorable action was taken against her as a result.

Wright's claim for wrongful termination due to her race is dismissed.


C. Alethea Martin & Natalie Vassell

*1. Facts*

The allegations of Vassell and Martin are sufficiently similar as to be addressed together: both were salespersons in the same department, discharged in early 2003 for lateness and

unexcused absences. Although they do not dispute that they were sometimes late or absent, both assert that white employees were not disciplined for the same conduct.

Alethea Martin was hired by Sonia Ebanks in March 1999 as a salesperson in the Contemporary Department. Defendant's Statement of Material Facts as to Claims of Althea Martin ("SOMF-M") ¶¶ 1- 2. She remained in Contemporary throughout her tenure at Neiman Marcus. She was supervised by, in succession, Ebanks, Lera Quistgaarol (white), "Amy" (white), Corin Wright (African-American), and Lynn Grzymkowski (white). SOMF-M ¶¶ 3-10.

Plaintiff Natalie Vassell was hired by Lera Quistgaarol in February, 2001, also as a salesperson in the Contemporary Department. Defendant's Statement of Material Facts as to Claims of Natalie Vassell ("SOMF-V") ¶¶ 1- 4. She remained in Contemporary during her tenure at Neiman Marcus, and was supervised by, in succession, Quistgaarol, Wright, and Grzymkowski.[4] SOMF-V ¶¶ 4,7,10.

On February 1, 2002, Wright issued a written discipline to Martin, citing forty-two instances in which she was late between November, 2001 and January, 2002. Deposition of Althea Martin ("Mar. Dep.") at 28. Plaintiff believes that she was not late as frequently as her time clock records indicate, and that many of her late arrivals were within the store's unofficial fifteen-minute grace period. Mar. Dep. at 31.

Wright orally counseled Vassell in 2002 for lateness as well. SOMF-V ¶ 6. On July 25, 2002, Human Resources issued a written discipline to Vassell, for lateness and excessive absences. SOMF-V ¶ 7. As with Martin, Vassell believes that she was not late as frequently as

---

[4]Vassell makes no mention of the "Amy" who, according to Martin, managed Contemporary between Quistgaarol and Wright.

her time clock records indicate, and that many of her late arrivals were within the store's unofficial fifteen-minute grace period. Deposition of Natalie Vassell ("Vass. Dep.") at 36-37.

Grzymkowski replaced Wright as manager of Contemporaries in October, 2002. SOMF-Ebanks ¶ 127. Around this time, Neiman Marcus implemented a new time-clock system. <u>See</u> § III.D.1 <u>infra</u>.

Grzymkowski issued one or two verbal warnings each to both Vassell and Martin about lateness. On December 7, 2002, she issued Vassell a "Final Warning" regarding Vassell's lateness and three unexcused absences in three weeks. Vass. Dep. at 47. Vassell agrees with the substance of the warning, but told Felicia Low of Human Resources and Grzymkowski that her latenesses were unintentional. <u>Id.</u> at 48.

Grzymkowski issued Martin a second written discipline for lateness on January 20, 2003, which, according to Martin, was her final warning. SOMF-M ¶ 10; Mar. Dep. at 41. Martin refused to sign the warning, believing that "they were picking on me for some reason." Mar. Dep. at 39. However, she admits that she was late sometimes. <u>Id.</u> at 45.

Martin was fired for being late on February 3, 2003. Affidavit of Felicia Low ¶ 8. Vassell was fired for lateness and unexcused absences on May 22. SOMF-V ¶ 33.

Both Martin and Vassell assert that numerous white employees were late during their period of employment. Martin lists six employees, known to her mostly by first name, who she believes were late and not disciplined. Affidavit of Alethea Martin (Mar. Aff.) ¶ 6 (listing "Lyn, Ireine, Mary Rohan, Tina, Terry, and Gerry"). Vassell asserts that, Karen Cardaci (white), Terry Stein (Asian-American), and Maria Ferber (white) were late, based on her observations of their arrival times, and were not disciplined. SOMF-V ¶ 20. Only Cardaci was a salesperson in the

Contemporary Department. SOMF-V ¶ 21. They offer no evidence from the store's records to substantiate these claims. Vassell also claims that Michelle Penque instructed Wright to "keep on top of her," Vass. Dep. at 61; and that on one occasion, Penque pushed her with her knuckles. Id. at 62. She claims that her observations of other African-American salespersons in other departments discouraged her from seeking a transfer. Id. at 79.

   *2. Discussion*

   Plaintiffs have made out a prima facie case for wrongful termination: both were members of a protected class, both were terminated, and both claim that the same white manager, Lynn Grzymkowski, decide to terminate them on the basis of race.

   Defendant has established a legitimate, non-discriminatory reason for their termination – Martin's lateness and Vassell's lateness and frequent absences. Each plaintiff received at least two written warnings, plus numerous oral admonitions, concerning their attendance records. The later warnings were apparently based on the records from Neiman Marcus' new time card system, installed in late 2002, rather than just on anecdotal evidence. Plaintiffs dispute the accuracy of these records to some degree, but acknowledge that they were sometimes late or absent.

   The question, therefore, is whether plaintiffs have met their burden in establishing that Neiman Marcus' alleged reason was pretextual. They have failed to do so.

   Employers have a perfect right to insist on punctuality. Summary judgment has been awarded when plaintiff employees are regularly tardy and absent, and failed to comply with other job requirements. See McLee v. Chrysler Corp., 109 F.3d 130,135 (2d Cir. 1997).

Plaintiffs' lateness was noted and criticized by both black and white managers, and both were disciplined on multiple occasions. No reasonable trier of fact could conclude that firing employees who were repeatedly – and admittedly – late was pretextual.

Plaintiffs allege that other white employees ( mostly those in other departments) were also late. They offer only their own general observations as evidence. They have not proffered any fact, such as time cards or attendance records, to support their claims, although they had ample opportunity to obtain such evidence through discovery. Neither have they identified specific occasions on which white employees were late but not disciplined. Plaintiffs' vague general conjectures are insufficient to raise a disputed issue of fact. See Ortiz v. Brookstone Co., 274 F. Supp. 2d 456, 464 (S.D.N.Y. 2003).

Nor have plaintiffs offered any evidence, besides their own conclusory statements, that other employees were not disciplined for lateness – a necessary element of establishing pretext. Again, such information (if it existed) could have been obtained through discovery.

Finally, plaintiffs offer no evidence of racial hostility against them prior to their termination. They assert that they were "picked on" by Grzymkowski, but offer no specifics. Their general statements contain no indication that race was ever mentioned; that derogatory racial comments were made; or that Grzymkowski or Low collaborated to get rid of minority employees.

Martin and Vassell allege that they observed no African-American salespersons in the more "lucrative" departments. Plaintiffs provided a spreadsheet listing revenue by department and by salesperson. It appears that Designer, Shoes, Handbags, Cosmetic Fragrances, and "Designer" were the most lucrative. Unfortunately, plaintiffs' spreadsheet does not identify the

race of salespersons in those (or any other) departments.

Martin and Vassell do not raise claims of failure to promote, and have not alleged that they ever sought transfer to such departments.

Martin and Vassell's claims for wrongful termination are dismissed.

D. June Wood-Smith

*1. Facts*

Plaintiff June Wood-Smith started at Neiman Marcus in 1999 as a salesperson in the Intimate Apparel Department. Defendant's Statement of Material Facts as to Claims of June Wood-Smith ("SOMF-WS") ¶ 1. She was managed by Jean Theroux, a white woman; her co-workers were white, Asian-American, and African-American. SOMF-WS ¶ 2.

Within a week of her arrival, she asked to transfer out of Intimate Apparel, because there was a lot of "underlying tension and stress" in the department. SOMF-WS ¶ 3. She repeated this request two weeks later. SOMF-WS ¶ 7. These requests were denied. SOMF-WS ¶ 7. It does not appear that she sought a transfer after the first month.

In June 2002, Wood-Smith submitted a memorandum to her Merchandise Manager, Mark Fillion, complaining about scheduling issues in her department. Deposition of June Wood-Smith ("WS. Dep.") Exh. 3. She claimed that Theroux arbitrarily changed the schedule and did not notify her that the schedule was being changed. She also alleged that other employees, such as Silvia Springer (white), received preferential treatment with regards to days off. Id. And she complained that Sylvia Springer and "Linda" (presumably, Linda Fried) had charged their returns to her employee number, which reduced her commissions. Id.

It was Wood-Smith's belief that Theroux sometimes prepared the schedule a week in advance, rather than a full month. SOMF-WS ¶ 23. Therefore, plaintiff had difficulty making long term plans, or knowing when her shift was scheduled. Id. Plaintiff asserted that white employees would be telephoned at home to tell them when to come in, but that she did not receive such calls because she was not one of Theroux's "phone pals." SOMF-WS ¶ 24, WS. Dep. at 110. She claims that Theroux was also more sensitive to Wood-Smith's lateness because she was black, and did not reprimand white employees for being late. WS. Dep. at 112. However, she does not believe that these events were part of a "conspiracy" against her. SOMF-WS ¶ 25.

Theroux testified that, as a regular practice, she made schedules on a monthly basis, but she would have to change them during the month to accommodate sick days, days off, and other last-minute changes. SOMF-WS ¶¶ 26-28, 31. Aside from occasional calls to employees at home regarding last-minute changes, Theroux did not make a habit of calling employees with schedules different from the posted schedule. SOMF-WS ¶ 29.

Two months later, on August 6, 2002, Wood-Smith wrote a second memorandum, titled "Hostility in the Workplace." WS. Dep. Exh. 4. The memorandum stated that, on one occasion, Linda Fried, a co-worker, made reference to "how you people talk, you know, that slang." Id. When Wood-Smith attempted to leave the room during this conversation, Fried blocked her way. Id. On another occasion, Lama Leslie, an African-American woman, made a comment about a prior dream in which Wood-Smith was partially naked, which Wood-Smith took to be a sexual advance. Id. The memorandum also claims that Springer had been urging other employees "not to talk to June." Id. Wood-Smith concluded her memo with a statement that these actions were

part of a conspiracy of the participants to drive her from Neiman Marcus. Id.

Wood-Smith claims that she gave other written notes to Bennett regarding scheduling and other issues. WS Dep. at 106-107. No such notes (except as described below) are part of the record.

Human Resources investigated the allegations in Wood-Smith's August 2002 memorandum, and concluded that the complaints of harassment could not be substantiated. SOMF-WS ¶¶ 48-50.

Wood-Smith also claims that she was mistreated by other employees on several cases not mentioned in her memoranda. On one occasion, Enza Witherell, a white woman, allegedly said "Let's get rid of her first," and "I will not work with her." WS. Dep. at 73-74. Although Wood-Smith got along fine with Witherell, she believed Witherell was an "unconscious racist." Id. at 74. At another time, Springer took a return on an item that Wood-Smith had sold, thus denying her a commission. WS. Dep. at 124. Apparently, it was understood that a salesperson who handled the return of another salesperson's sale would ring up any exchange under the first salesperson's account to maintain commission levels.

Wood-Smith complained that Judith Brenner, a white woman and the sole part-time salesperson, often did not close the department at the end of the day, requiring Wood-Smith to close. WS. Dep. at 86-87. However, she admitted that other white full-time employees were required to close. Id. at 88.

Prior to her termination, Wood-Smith was reprimanded on several occasions for incidents that occurred between her and other staff members, or with customers. Several of these incidents occurred when plaintiff allegedly failed to comply with the customer service practices of the

department. SOMF-WS ¶¶ 5, 9, 17-18. Wood-Smith allegedly acted rudely towards other salespeople, calling one a "crazy lady" and insulting an intern in front of customers. SOMF-WS ¶¶ 12, 15. Several customer complaints were placed in her employee file. SOMF-WS ¶ 119.

In late 2002, Neiman Marcus implemented a new computer time-card system. SOMF-WS ¶ 63. In January 2003, a Human Resources audit of the system uncovered information that Wood-Smith had both arrived late to work forty-nine times, and had often manually changed her arrival and departure times after the fact. SOMF-WS ¶ 67. She was counseled for lateness and for entering arrival and departure times manually rather than on the clock. Id. She refused to sign the warning when it was given to her. Id.

Wood-Smith argues that her lateness was due in part to Theroux's failure to post the schedule sufficiently in advance. SOMF-WS ¶¶ 69-72. She does not cite a single instance in which, the day before a lateness incident, she was not aware of the time she was due to arrive the next day. Wood-Smith also claims that she would frequently forget to punch in upon her arrival, and would manually insert the times later to reflect the time she actually worked.

Theroux counseled Wood-Smith in February, March, April, and May for lateness or for leaving early. SOMF-WS ¶¶ 72-77. She was given a final warning on May 3, 2003. SOMF-WS ¶ 79. Wood-Smith did not sign the final warning, believing that the warning was given to retaliate against her for prior complaints about the schedule. SOMF-WS ¶ 85. However, she agrees that she manually adjusted her time card data often. SOMF-WS ¶¶ 83-84.

On June 10, 2003, Wood-Smith submitted another memorandum to Human Resources, entitled "Continued Hostility in the Workplace." WS. Dep. Exh. 10. It complained about Human Resources' failure to investigate an incident in which she was pushed by an African-American

employee, re-iterated her prior complaints about the untimeliness of her department schedules and the harassment from other employees, and objected to the recent complaints about her lateness. Id., SOMF-WS ¶ 89. She also complained that Theroux was rude to her and pushed papers at her at one occasion; Wood-Smith claims this would not have happened to a black person. SOMF-WS ¶¶ 95-96.

In July 2003, Gabrelle Martin, Associate Relations Director of the Neiman Marcus, came to White Plains to investigate Wood-Smith's allegations, as well as Sonia Ebanks' EEOC complaint. See SOMF-WS ¶ 104. Martin was told that there were numerous customer complains in Wood-Smith's file, including one that happened while Martin was present and investigating . Deposition of Gabrelle Martin at 43. Neiman Marcus does not have a written policy about disciplining employees based on customer complaints. Id. at 53 Martin concluded that Wood-Smith had too many, although Martin did not personally review these complaints or view any documentation. Id. at 43.

Based on the information she was given, Martin told Wood-Smith that, if she received another customer complaint, she would be terminated. SOMF-WS ¶ 111. Martin also counseled Theroux about preparing monthly schedules earlier. SOMF-WS ¶ 113.

On July 18, 2003, a customer came to the department to complain to Theroux about Wood-Smith's failure to order an article of clothing for her, despite several follow-up phone calls. SOMF-WS ¶ 115. She asked to be helped by someone other than Wood-Smith. SOMF-WS ¶ 116. Theroux took down the customer's complaint and ordered the item from another location.

While the customer was making the complaint, Wood-Smith noticed that the staff was looking at her. She thought the customer looked familiar, so she approached the customer to

offer to help. WS. Dep. at 186-87. The customer said, "No, it isn't you." Id. Wood-Smith

believes that the woman making the complaint was not her customer, but rather Collette

Broomfield's (another salesperson). Pl. SOMF ¶¶ 41-42.

The customer complaint was reported by Theroux to Jeff Oldt, Human Resources

Manager, who told Martin. SOMF-WS ¶ 119. Theroux did not recommend that Wood-Smith be

terminated at that time. Deposition of Jean Theroux at 73. Martin made the decision, based on

her prior warning, to terminate Wood-Smith. Theroux was not informed of the decision until

after the fact. SOMF-WS ¶¶ 119-120.

Plaintiff did not have any conversation with Theroux, Martin, or anyone in her

department after her termination. WS. Dep at 191-92.


*2. Discussion*

*(i) Wood-Smith Has Established a Triable Issue of Fact on her Claims of Retaliation and Race Discrimination.*

Wood-Smith claims that she was wrongfully retaliated against after she submitted a

memorandum to Human Resources on June 10, 2003, complaining of discrimination against her

in the workplace. An internal complaint may be "protected" activity if it is directed at an

employer's unlawful employment practices, such as racial discrimination in hiring. See

Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 594 (2d Cir.

1988). The letter may be fairly read to allege racial discrimination. Indeed, defendant's Human

Resources Department read it so, and brought in Martin to investigate its contents as a result. It

is, therefore, protected activity.

Wood-Smith was fired less than two months after filing the complaint, and Gabrelle

Martin, who made the decision to fire her, was aware of the complaint.  The proximity in time between the complaint and Wood-Smith's termination in July could support an inference that the termination was caused in part by management's displeasure with her complaints of discrimination.

Defendant offers a valid, non-discriminatory reason for her termination: Wood-Smith's poor customer service record and repeated warnings by Human Resources. I admit that defendant makes a compelling case for Wood-Smith's inadequacy as an employee. Repeatedly late, guilty of altering records, the subject of numerous customer complaints, and a complainer to boot, Wood-Smith is no employer's idea of an ideal employee.

However, Wood-Smith raises a genuine issue of fact concerning pretext. Wood-Smith had been warned that she would be fired if another customer registered a complaint; however, it is not clear that a customer actually complained about Wood-Smith. Theroux filed the complaint, but did not seek Wood-Smith's termination. Moreover, Martin, who investigated the complaints made by Wood-Smith and others, gave Wood-Smith a final warning without reviewing her file to verify the existence or nature of any alleged customer complaints, without speaking to Wood-Smith, and without consulting Theroux or other White Plains managers. These facts might support an inference that Wood-Smith's complaint, rather than her poor employment history, prompted Martin to fire her, though I admit the evidence is thin.

Defendant's motion for summary judgment on Wood-Smith's claim of retaliation is denied.

Because I am submitting these claims to the jury, I will also let Wood-Smith go to trial on her wrongful termination claim as well. I do so reluctantly, because it does not appear that

plaintiff has offered any evidence to show that Gabrelle Martin, a black woman, fired her because she was black, or without adequate cause. Nonetheless, for the reasons set forth in connection with the retaliation claim, the discrimination claim goes to trial.

The fact that five black women complain about race discrimination at Neiman Marcus does not change any of the above analysis. Each individual plaintiff was required to offer evidence to raise genuine issues of fact on her individual claims. As described above, most of the plaintiffs fell well short of that standard. One cannot infer that all these plaintiffs' claims should go to trial from the fact that some claims are going to trial.

## IV. Conclusion

For the reasons stated above, all claims of plaintiffs Corin Wright, Natalie Vassell and Alethea Martin are dismissed, as are plaintiff Sonia Ebanks' claims for retaliation, wrongful discharge, and failure to promote. Summary judgment is denied as to Ebanks' claims for wage discrimination and June Wood-Smith's claims for retaliation and for wrongful termination.

A trial date on all remaining issues will be set at the earliest opportunity.

This constitutes the decision and order of this Court.

February 3, 2006

_____
U.S.D.J.

BY FAX TO ALL COUNSEL

-36-